<u>NOT FOR PUBLICATION</u>

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| THOMAS GLOBAL GROUP, LLC, | : |
| Plaintiffs, | : **Civil Action No. 13-04864 (SRC)** |
| v. | : |
|  | : **OPINION** |
| DONALD V. WATKINS, WATKINS PENCOR, LLC, PENCOR-ORANGE CORP., PENCOR-MASADA OXYNOL, LLC, MASADA OXYNOL US-I, LLC, VULCAN RESOURCES, LLC, CONTROLLED ENVIRONMENTAL SYSTEMS CORP., MASADA RESOURCE GROUP, LLC, MASADA OXYNOL, LLC, MASADA OXYNOL US-I, LLC, OXYNOL SOLUTIONS LIMITED, W2E RESOURCES, S.A., and MASADA RESOURCES, LLC, | : |
| Defendants. | : |

**<u>CHESLER</u>**, District Judge

This matter is before the Court on two motions. The first is a motion for a preliminary injunction filed by Plaintiff Thomas Global Group, LLC ("Plaintiff" or "TGG"), by which Plaintiff asks this Court to stay and dismiss an arbitration between the parties currently pending before the American Arbitration Association ("AAA"). [Docket Entry 5.] The second is Defendants' motion to compel arbitration and either dismiss the Complaint or stay this action pending the outcome of the aforementioned arbitration proceeding. [Docket Entries 7 & 9.][1]

---

[1] Defendants' motion is actually two separate motions, one to dismiss [Docket Entry 7] and one to compel arbitration [Docket Entry 9]. Indeed, the later filed motion to compel was apparently only filed "[i]n an abundance of caution." (See Defs.' Mov. Br. at 1.) As both seek the identical

The Court heard oral argument on January 29th, 2014.  For the foregoing reasons, the Court will grant Plaintiff's motion and deny Defendants'.  There is not presently before the Court an enforceable arbitration agreement to which Plaintiff is a signatory, and in the absence of such an agreement, Plaintiff cannot be compelled to arbitrate against its wishes.

I.   Background

The Complaint in this case asserts an encyclopedia of claims (twelve in total, including breach of contract and a violation of SEC Rule 10b-5) against thirteen separate Defendants.[2]  At bottom, however, this lawsuit is a dispute over the status of a $1 million investment which purports to give Plaintiff the right to one-percent of certain future cash flows received by Defendant Donald Watkins ("Watkins"), an Alabama businessman and attorney.  The Complaint contends that TGG has yet to see a return on its investment, and indeed has received no information at all regarding the status of the investment or to what use the $1 million was put.  The relevant background is as follows.

According to the Complaint, in March 2009 Watkins invited TGG's principal, Bryan Thomas, to invest in Defendant Watkins-Pencor, LLC, a company developing "waste to energy" processes and of which Watkins is the Managing Member.  (Compl. ¶¶ 7, 22.)  Watkins' solicitation, described in the complaint as involving "highly optimistic representations

---

relief, and make identical arguments, the Court will treat them as a single motion to dismiss and compel arbitration.

[2] Subject matter jurisdiction, which has not been challenged here, is exercised pursuant to 28 U.S.C. § 1331, as Plaintiff brings causes of action pursuant to the federal securities laws and the federal Declaratory Judgment Act.  The Court exercises supplemental jurisdiction over the state law claims.  See 28 U.S.C. § 1367(a). The Court notes that the Complaint names a number of limited liability companies as Defendants, yet fails to name all of the members of each of those companies.  (See Compl. ¶¶ 9-15, 17.)  The Complaint thus fails to satisfy the requirements for diversity jurisdiction.  See Zambelli Fireworks Mfg. Co., Inc. v Wood, 592 F.3d 412, 420 (3d Cir. 2010) (holding that, for purposes of diversity jurisdiction, "the citizenship of an LLC is determined by the citizenship of its members").

2

regarding" the high profit and low risk of the Watkins-Pencor investment, occurred both over the phone and during an in-person meeting in New Jersey with Bryan Thomas and his wife. (Compl. ¶¶ 22, 25.) As part of his sales pitch, Watkins allegedly represented to Thomas that his "waste to energy" businesses – comprised of Watkins-Pencor and a number of the other entity Defendants – were affiliated with "high profile individuals" including Condoleeza Rice (a "senior global advisor" to Defendant Masada Resource Group, LLC) and Martin Luther King III (engaged to promote the businesses to President Obama). (Compl. ¶¶ 23-24.)

TGG ultimately invested $1 million, "in reliance upon Watkins' representations" and "false promotional materials" provided by him. (Compl. ¶ 25.) The investment was memorialized in a "Purchase Agreement and Irrevocable Assignment of Economic Interests" (the "Purchase Agreement"), dated March 17, 2009, which reads in pertinent part:

> In consideration for payment of [$1 million], Watkins-Pencor, LLC . . . hereby grants and conveys to [TGG] . . . one percent (1.0%) of the total economic interests (i.e., cash distributions for the life of the waste-to-ethanol investment) to which Donald V. Watkins is entitled by virtue of his ownership of [certain Defendant entities]. These economic interests may be received by [Watkins] from [certain Defendant entities, including Pencor Orange Corporation and Masada Resource Group, LLC.]

(Thomas Cert., Ex. B, at 1.) Two other provisions of the Purchase Agreement are relevant here. First, the Purchase agreement states that "TGG acknowledges that its investment . . . involves a high degree of risk and is suitable only for persons or entities that . . . can bear the loss of their entire investment." (Id.) Second, the Purchase Agreement states that "the conveyance and assignment of economic interests are irrevocable, but are subject to the assignment provisions of any and all limited liability corporation [sic] operating agreements in force to which [certain Defendant entities] are parties." (See id.)

The "subject to" language is important, because one of the Defendant entities, Masada Resource Group, LLC ("MRG"), does in fact have an Amended and Restated Operating Agreement (the "Operating Agreement"), and that Operating Agreement contains an arbitration clause. The parties focus on two provisions of the Operating Agreement in particular. The first, of course, is the arbitration clause itself. The arbitration clause provides that

> [o]ther than actions for specific performance or injunctive relief, the Members and the Company[3] agree that any and all claims, disputes or other matters in question among or between Class Members, Class B Members, the Company or any combination thereof and arising out of, based upon or relating to this Agreement or any breach hereof . . . or any relationship or duty among or between the parties arising from this Agreement shall be subject to and decided by binding arbitration conducted in Birmingham, Alabama in accordance with the Commercial Arbitration Rules of the American Arbitration association currently in effect.

(Watkins Aff., Ex. B, § 18.6.)

The second provision is Section 13.3, entitled "Agreement Binding on Assignee." This section reads: "[e]ach assignee . . . shall by his or her acceptance of a Disposition of a Membership Interest, be deemed to be bound by all of the terms and conditions of this Agreement . . . ." (See id. at § 13.3.) The term "assignee" is itself defined in the Operating Agreement, and that definition contains within it another defined term, which contains within it yet another set of defined terms. An "assignee" is either a "Class A Assignee or Class B Assignee," (see id., Ex. B., § 1.10), and Class A and B Assignees are defined as "transferee[s] of" Class A or Class B "Membership Interest[s], transferred in compliance with Article [13 of the Operating Agreement] . . . ." (Id. at §§ 1.25-1.26.) Confusingly, the definition of a "Class A" or "Class B" "Membership Interest" is different than the definition of "Membership Interest,"

---

[3] "'Company' means Masada Resource Group, L.L.C., . . . and any successor limited liability company." (Watkins Aff., Ex. B, § 1.34.)

which is the language used in the assignment provision.  A "Class A" or "Class B" "Membership Interest" is "the rights of a Class A [or Class B] Member or, in the case of an Assignee, the rights of the assigning Class Member, in Distributions . . . and allocations of the profits, losses, gains, deductions and credits of the company."  (Id. at §§ 1.28, 1.30.)  In contrast, a "Membership Interest," which again is the term used in the assignment provision itself, is defined as "the rights of the Member or, in the case of an Assignee, the rights of the assigning member, in Distributions . . . and allocations of the profits, losses, gains, deductions and credits of the Company, together with such Member's Capital Interests of the Company."  (Id. at § 1.57.)

It is undisputed that TGG is not a signatory to the Operating Agreement, and the Complaint alleges that TGG has never, prior to this lawsuit, seen the MRG Operating Agreement, its assignment language, or the arbitration clause.  As such, the Complaint alleges that Plaintiff was surprised when it received a demand to submit to an arbitration proceeding before the American Arbitration Association ("AAA").[4]  The Arbitration Complaint seeks various forms of declaratory relief, including a "judgment that the economic participation interest . . . purchased by TGG is exempt from" federal and state securities registration requirements; a "judgment that TGG is bound by the operating agreement of [MRG], including the arbitration provisions"; and a "judgment that Pencor has no legal obligation or duty to refund TGG's purchase price money."  (See Watkins Aff., Ex. D, at 5.)

After the AAA denied Plaintiff's request to have the arbitration proceeding terminated for want of jurisdiction, Plaintiff filed the instant lawsuit in this Court.  The Complaint alleges twelve separate causes of action, the sufficiency of which this Court will not address at this juncture.  See Eprotec Preservation, Inc. v. Engineered Materials, Inc., No. 10-5097 (DRD),

---

[4] TGG had, prior to receipt of the arbitration demand, sent a letter through counsel to Watkins demanding the return of the $1 million.  (Compl. ¶ 39.)

2011 WL 867542, *5 n.4 (D.N.J. Mar. 9, 2011) ("While 'a court may *sua sponte* raise the issue of deficiency of a pleading under Rule 12(b)(6) provided that the litigant has the opportunity to address the issue either orally or in writing,' in this case the Plaintiff has not had the opportunity to do so." (quoting Roman v. Jeffes, 904 F.2d 192, 196 (3d Cir. 1990))).  The Complaint also originally sought, pursuant to Local Civil Rule 65.1, an Order To Show Cause with temporary restraints staying and dismissing the AAA arbitration proceeding.  (See Compl., Ex. 1.)  Plaintiff's request for emergent relief was denied for failure to satisfy the Local Rule, and Plaintiff's motion for a preliminary injunction seeking identical relief was filed the next day.  [Docket Entry 5.]  Defendants then cross-moved to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, and dismiss or stay this action.  [Docket Entries 7 & 9.]  The Court heard oral argument on the motions, and this Opinion follows.

## II.  The Motion for a Preliminary Injunction

Plaintiff argues that it has satisfied the well-worn four factor inquiry governing a motion for preliminary injunction made pursuant to Federal Rule of Civil Procedure 65(a), and an Order enjoining the pending AAA arbitration proceeding is therefore appropriate.  (Plf.'s Mov. Br. at 8.)  The operative factors are: "(1) whether the movant has a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denying the injunction; (3) whether there will be greater harm to the nonmoving party if the injunction is granted; and (4) whether granting the injunction is in the public interest."  B.H. ex rel. Hawk v. Easton Area School Dist., 725 F.3d 293, 302 (3d Cir. 2013) (quoting Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243, 252 (3d Cir. 2002)).  The Third Circuit has recently reaffirmed that "[a]

plaintiff seeking an injunction must meet all four criteria . . . ." Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health and Human Servs., 724 F.3d 377, 382 (3d Cir. 2013).

Plaintiff and Defendants join issue over each element, focusing particularly on the likelihood of success and irreparable harm elements. But this extensive analysis is unnecessary in this case, where all the Plaintiff asks is to have this Court halt or stay an improvidently initiated arbitration proceeding. It is well established that a court is "obliged to enjoin an arbitration" where it is determined "that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside the substantive scope of the agreement . . . ." PaineWebber Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990), *abrogated on other grounds by* Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002); see also In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 141 (2d Cir. 2011) ("If the parties . . . have not consented to arbitrate a claim, the district court [is] not powerless to prevent one party from foisting upon the other an arbitration process to which the first party had no contractual right." (citing Hartmann, 921 F.2d at 511)); Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. and Sys. Co., 643 F.2d 863, 868 (1st Cir. 1981) (Breyer, J.). "[A] district court may only order, or enjoin, arbitration based on the agreement to arbitrate itself. . . . This includes, as a matter of course, an exploration into whether the parties entered into a valid arbitration agreement in the first instance . . . ." John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132, 137 (3d Cir. 1998). Indeed, the only real dispute in this case is whether TGG and any of the Defendants entered into an enforceable arbitration agreement in the first place. (See, e.g., Plf.'s Mov. Br. at 4 ("there is no contractual agreement between TGG and Watkins to arbitrate any dispute between them"); Defs.' Mov. Br. at 6 ("TGG and Defendants agreed to a broad and enforceable arbitration

provision that requires an arbitrator to decide all disputes.").)  It is therefore readily apparent that the Court need not walk mechanically through each element of the preliminary injunction analysis but must instead a different and more basic question – whether TGG entered into an agreement to arbitrate claims against the named Defendants and, if so, whether the claims asserted in this lawsuit fall within the scope of the arbitration agreement.

In other words, the Court needs to address the Defendants' motion to compel arbitration, which contemplates a resolution of both of these questions.  See Olick, 151 F.3d at 138 ("[T]he threshold questions a district court must answer before compelling or enjoining arbitration are these: (1) Did the parties seeking or resisting arbitration enter into a valid agreement? (2) Does the dispute between those parties fall within the language of the arbitration agreement?").  At least as this case is currently postured, the motion to enjoin the arbitration is nothing more than the flipside of the motion to compel the arbitration, and a negative resolution of latter will necessitate a positive resolution of the former.  If however the Court finds that TGG is contractually obligated to arbitrate any of its claims against any of the Defendants, the Rule 65 motion would necessarily fail, at least as to those claims which must be submitted to arbitration – a party simply cannot be irreparably harmed by being compelled to arbitrate against its will pursuant to a binding contract.

### III. The Motion to Compel Arbitration

#### A. Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, provides "the body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes" and expresses "a strong federal policy in favor of resolving disputes through arbitration."

Century Indem. Co. v. Certain Underwriters at Lloyd's, 584 F.3d 513, 522 (3d Cir. 2009) (citations omitted). Arbitration, however, "is simply a matter of contract between the parties: it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). A court cannot force a litigant to "submit to arbitration any dispute which he has not agreed so to submit." AT & T Techs., Inc. v. Commc'ns. Workers of Am., 475 U.S. 643, 648 (1986); Century Indem., 584 F.3d at 523. Thus, "[t]he question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the *question of arbitrability*, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." Puleo v. Chase Bank USA, N.A., 605 F.3d 172, 178 (3d Cir. 2010) (en banc) (alteration in original) (quoting Howsam, 537 U.S. at 83). A court facing a demand to compel arbitration must therefore determine that "(1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement" before granting the demand. See Century Indem., 584 F.3d at 523 (citing Kirleis v. Dickie, McCamey & Chilcotte, P.C., 560 F.3d 156, 160 (3d Cir. 2009)).

As to the first question, the Third Circuit has recently clarified "the standard for district courts to apply when determining whether, in a specific case, an agreement to arbitrate was actually reached." Guidotti v. Legal Helps Debt Resolution, LLC, 716 F.3d 764, 771 (3d Cir. 2013). After Guidotti, a district court should apply a Rule 12(b)(6) analysis "without discovery's delay" where "it is apparent, based on 'the face of the complaint, and documents relied upon in the complaint,' that certain of a parties claims 'are subject to an enforceable arbitration clause.'" Id. at 776 (quoting Somerset Consulting, LLC v. United Capital Lenders, LLC, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)). The universe of documents available to a district court under this

9

analysis is duly circumscribed – the district court can only consider the complaint, exhibits attached thereto, documents in the public record, and "undisputedly authentic documents if the complainant's claims are based upon those documents." See id. at 772 (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)).

Where, however, this limited universe of documents "is unclear regarding the agreement to arbitrate," or if the plaintiff opposes the motion to compel with facts "sufficient to place the agreement to arbitrate in issue," a Rule 56 summary judgment standard is proper and a more deliberate pace required. See id. at 776. Stated differently, where "the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate," "a Rule 12(b)(6) standard is inappropriate . . . ." Id. at 774. In this circumstance, the district court should provide the parties with "discovery on the question of arbitrability" before entertaining "further briefing on" the question of arbitrability. Id. at 776 (quoting Somerset, 832 F. Supp. 2d at 482). Only after discovery can the district court then "entertain a renewed motion to compel arbitration" and evaluate such motion "under a summary judgment standard." See id.

B. Analysis

Echoing Guidotti, this Court must determine whether the Complaint, the Purchase Agreement, and the MRG Operating Agreement, when read together, "establish on their face" that TGG agreed to be bound by the Operating Agreement's arbitration clause, "thereby triggering a Rule 12(b)(6) standard." See id. at 776.[5] In this regard, Defendants' make two

---

[5] Of course, the MRG Operating Agreement was not attached to the Complaint and certain of TGG's claims, like fraud in the inducement and violation of the Exchange Act, are not "based upon" that document. See Guidotti, 716 F.3d at 772. But some of TGG's other claims, such as the accounting claim, would appear to derive in some respect from formation documents like the

interrelated arguments. First, Defendants argue that the Purchase Agreement incorporates the Operating Agreement's assignment provision, and because that provision binds assignees to all of the Operating Agreement's terms, TGG is effectively a signatory to the Operating Agreement's arbitration clause. (Def.'s Mov. Br. at 8-9.) Defendants also argue that the threshold question of arbitrability is not even properly before this Court, and that TGG has agreed to submit the question of arbitrability to the arbitrator in the first instance. (Id. at 10-11.) This latter contention relies on the same inferential pathway as the initial argument, but tacks yet another inference on top of it. According to Defendants: (1) the Purchase Agreement incorporates the Operating Agreement's assignment provision; (2) the assignment provision binds TGG to the Operating Agreement's arbitration clause; (3) the arbitration clause incorporates the AAA's Commercial Arbitration Rules; and (4) those Rules provide the arbitrator with the "power to determine the arbitrability of claims . . . ." (Id. at 10.) Under this logic, TGG agreed to have an AAA arbitrator, as opposed to a court, determine if all twelve of its claims against Defendants are arbitrable.

Both contentions are untenable, as Defendants' arguments simply cannot be reconciled with the express language of the Operating Agreement. Initially, the Court agrees with Defendants insofar as the Purchase Agreement does appear to subject TGG to "the assignment provisions of any and all" LLC operating agreements to which various entity Defendants are parties. (Thomas Cert., Ex. B, at 1.) The Court also agrees with Defendants that the language contained in the MRG Operating Agreement's assignment provision is key. (See Defs.' Mov. Br. at 8.) But as TGG emphasized at oral argument, for the Operating Agreement's assignment provision to actually bind TGG to the arbitration clause, TGG would have to be an "assignee"

---

Operating Agreement. The Court thus assumes, *arguendo*, that the Operating Agreement is cognizable at this stage.

11

who accepted a "Disposition of a Membership Interest."  (<u>See</u> Watkins Aff., Ex. B, § 13.3 ("Each assignee . . . shall by his or her acceptance of a Disposition of a Membership Interest, be deemed to be bound by all of the terms and conditions of this Agreement . . . .").)  A "Membership Interest," as opposed to a "Class A" or "Class B" "Membership Interest," includes both the Member's "Distributions . . . and allocations of the profits, losses gains, deductions and credits of the Company" as well as the "Member's Capital Interests of the Company."  (<u>See</u> <u>id.</u> at § 1.57.)

There is, however, simply nothing in the two-page Purchase Agreement that could even colorably indicate that Watkins, Watkins Pencor, LLC, or any other Defendant entity intended to transfer to TGG any "Capital Interests of" MRG, considering the Operating Agreement defines that term as "the balances in the Members' respective Capital Accounts."  (<u>Id.</u> at § 1.19.)  Indeed, the Purchase Agreement indicates the opposite – the parties only agreed to give TGG the right to one-percent of "cash distributions" received by Watkins "by virtue of [Watkins'] ownership of [an entity Defendant] and [that Defendant's] membership interest in [other entity Defendants]."  (Thomas Cert., Ex. B, at 1.)  Even taking at face value Defendants' argument that TGG is an assignee of a Class A Member of MRG because TGG accepted an "economic interest" in Watkins' future cash flows (<u>see</u> Def.'s Reply Br. at 3-4), by the terms of the Operating Agreement itself TGG could not have accepted a disposition of a "Membership Interest" such that TGG could "be deemed to be bound" by the other provisions of the Operating Agreement, including the arbitration clause.  The most that could be said based on the Purchase Agreement is that TGG agreed to receive a percentage of monies generated by whatever Capital Interests an assignor had, not that TGG actually received a percentage of those Capital Interests itself.

Stated differently, the Operating Agreement's assignment language, so crucial to the motion to compel, is inherently ambiguous – does it bind only to "assignees" (individuals given an interest in certain cash flows) or does it bind "assignees" who have accepted "Membership Interest[s]" (individuals given certain cash flows plus an additional capital interest in MRG)? With the binding effect of the assignment provision on TGG far from clear, it cannot be said that the documents before the Court "establish on their face" that any of TGG's claims are subject to an enforceable arbitration clause.  See Guidotti, 716 F.3d at 776.  This is particularly so where TGG's principal avers that he never saw the Operating Agreement when he executed the Purchase Agreement and Defendants do not state otherwise.  (See Watkins Aff., ¶ 13 (stating that certain Masada "documents" and "records" "were made available to TGG").)  In light of Guidotti, such a critical ambiguity requires this Court to "move beyond the pleadings and trigger[s] the application of the summary judgment standard to determine whether there was a meeting of the minds on the agreement to arbitrate."  See 716 F.3d at 778-79.

In short, it is entirely unclear that the Purchase Agreement incorporates the Operating Agreement's arbitration clause pursuant to the Operating Agreement's assignment language.  In such a circumstance, basic principles of contract interpretation require this Court to consider evidence outside the face of the documents.  See, e.g., Mylan v. SmithKline Beecham Corp., 723 F.3d 413, 420 (3d Cir. 2013) ("Evidence of the circumstances is always admissible in aid of the interpretation of a [contract]." (quoting Sumimoto Mach Corp. v. AlliedSignal, Inc., 81 F.3d 328, 332 (3d Cir. 1996))).  Limited discovery into the existence of an agreement to arbitrate will presumably shed light on such interpretative evidence, should any exist, which is one reason why Guidotti requires discovery into the question in all but the clearest circumstances.  See 716 F.3d

13

at 774.  On the limited record presently before the Court, however, the evidence is too thin, the connections too attenuated, and the intent to arbitrate simply too difficult to discern to allow this Court to determine that the Purchase Agreement incorporates an arbitration clause otherwise not present on its face.

*A fortiori*, then, TGG could not have, as Defendants contend, contractually agreed to give the AAA the authority to usurp the Court's traditional role and determine for itself the question of arbitrability.  Having found to be dubious Defendants' Tinker to Evers to Chance argument – *i.e.*, the Purchase Agreement clearly binds TGG to the MRG Operating Agreement's arbitration clause by virtue of the Operating Agreement's assignment provision – the Court need not belabor the even more attenuated arbitrability argument, as that argument presupposes the existence of an enforceable arbitration agreement.  Simply put, the "Supreme Court has made clear" that courts cannot find that litigants agreed to arbitrate the arbitrability question "unless there is 'clear and unmistakable' evidence [the parties] did so.'"  Puleo, 605 F.3d at 187 (alterations omitted) (quoting First Options, 514 U.S. at 944).  Here, such evidence is absent, and even assuming the question were ambiguous, "ambiguity on the 'who should decide arbitrability point' must be resolved in favor of judicial resolution of questions of arbitrability."  See id. at 188 (quoting First Options, 514 U.S. at 945).

The Court will therefore deny Defendants' motion to compel arbitration without prejudice to Defendants renewing the motion under a summary judgment standard after relevant discovery into the issue of arbitrability.  See Guidotti, 716 F.3d at 776; Hughes v. Kolaras, No. 13-0057 (JAP), 2013 WL 5797735, at *7 (D.N.J. Oct. 27, 2013).  In light of the determination that there is not presently an enforceable arbitration agreement before the Court, the pending

AAA arbitration must be enjoined, at least until the resolution of Defendants' renewed motion to compel. Hartmann, 921 F.2d at 511; Olick, 151 F.3d 132, 137.

A final note. The Court highlighted at oral argument Defendants' contention that to the extent TGG asserts claims against Defendant MRG directly – *e.g.*, for a statutory accounting – it would appear that TGG would only be able to do so by standing in the shoes of a Class A or Class B member of that entity. (See Defs.' Mov. Br. at 9.) In such a circumstance, TGG's rights would derive from the Operating Agreement itself. As such, TGG would arguably be equitably estopped from claiming rights derivative of the Operating Agreement while avoiding the effect of that Agreement's arbitration clause. See Hirsch v. Amper Fin. Servs., LLC, 71 A.3d 849, 859-60 (N.J. 2013) (rejecting "intertwinement" theory as basis by which to compel arbitration, but noting that "equitable estoppel may be used in certain circumstances as a basis to compel arbitration").

The problem for Defendants under this theory is that the operative arbitration clause, assuming it were enforceable under an estoppel theory, does not apply to "actions for specific performance or injunctive relief . . . ." (Watkins Aff., Ex. B, § 18.6.) An accounting is traditionally an equitable remedy which is injunctive in nature. See Borough of Kenilworth v. Graceland Memorial Park Assoc., 199 A. 716, 717 (N.J. Ch. 1938) (discussing common law accounting). The very terms of the arbitration clause thus render claims like an accounting non-arbitrable. This problem is compounded by the fact that the Complaint generally does not specify which of its twelve causes of action applies to which of the named thirteen Defendants. (See, e.g., Compl ¶ 87 ("TGG is entitled to a common law [and statutory accounting] from [D]efendants").) As such, the Court cannot carve out what might be arbitrable claims from the

remainder of TGG's lawsuit, which must remain in this Court pending a renewed motion to compel.[6]  Given this lack of clarity, the need for discovery into threshold issues of contract formation is even clearer, and only after such fact development can the Court – applying the proper Rule 56 standard – make an appropriate decision regarding what if any of this lawsuit is arbitrable.

**IV.   Conclusion**

For the reasons stated herein, the Court will deny without prejudice Defendants' motion to dismiss and compel arbitration.  Defendants shall have leave to file a renewed motion to compel arbitration after limited discovery into the question of arbitrability.  Furthermore, the Court will grant Plaintiff's motion to enjoin the pending AAA arbitration between the parties, and the AAA proceeding will be stayed pending the resolution of Defendants' renewed motion.  An appropriate form of Order will be filed.

        s/ Stanley R. Chesler
        STANLEY R. CHESLER
        United States District Judge

Dated:  April 8th, 2014

---

[6] The briefs submitted by both parties fail to address this point with adequate specificity.  Thus, the parties are directed to submit supplement briefing regarding which, if any, of Plaintiff's claims against Defendant MRG are properly brought in arbitration as derivative of TGG's rights as an assignee of that entity.  Each party shall submit an initial brief fourteen (14) days after the entry of the accompanying Order.  Initial briefs are limited to twenty (20) pages.  Responsive briefs shall be limited to ten (10) pages and shall be submitted a week after the initial briefs are served.