

Bob Kasolas
Direct Dial: 973-403-3139
Direct Fax: 973-618-5539
E-mail: bkasolas@bracheichler.com

July 5, 2016

**VIA ECF**

Hon. Cathy L. Waldor
United States Magistrate Judge
United States District Court
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

        Re:    **Thomas Global Group L.L.C. v. Watkins, et. al.
Civil Action No. 2:13-cv-4864
Opposition to Defendants' Cross-Motion to Strike
Kasolas Certification/Sur-Reply to Cross-Motion to
Vacate/Modify Confidentiality Order and Motion to
Compel Discovery Filed July 20, 2015/Opposition to
Defendants' Motion for Protective Order**

Dear Judge Waldor:

      This firm represents plaintiff Thomas Global Group ("TGG") in the above-captioned matter. Kindly accept this opposition/sur-repy letter brief in lieu of a more formal response to the "cross-motion" field by the Watkins defendants to strike the Certification of Bob Kasolas, Esq. and in further support of TGG's July 20, 2015 motion to compel discovery and motion to vacate/modify the September 26, 2014 Confidentiality Order in place in this matter.

5 Penn Plaza, 23rd Floor
New York, New York 10001
212.896.3974

101 Eisenhower Parkway
Roseland, New Jersey 07068
973.228.5700

2875 South Ocean Blvd., Suite 200
Palm Beach, Florida 33480
561.899.0177

www.bracheichler.com

BE:8573029.1/THO168-265602

Hon. Cathy L. Waldor
July 5, 2016
Page 2

# FACTS

The relevant facts in this matter are set forth in the June 20, 2015 Certification of Bob Kasolas, Esq. (Docket # 71) filed in support of TGG's pending July 20, 2015 motion to compel discovery; (ii) the Certification of Bob Kasolas, Esq. in support of TGG's cross-motion to vacate/modify the Consent Confidentiality Order and in Opposition to defendants' motion for Protective Order/to Seal; (iii) the Certification of Kelly Rutkowski, Esq. in support of TGG's cross-motion to vacate/modify the Consent Confidentiality Order and in Opposition to defendants' motion for Protective Order/to Seal; (iv) the Certification of Bob Kasolas, Esq. in Support of TGG's cross-motion to seal documents relied upon by TGG in its opposition to defendants' motions and TGG's cross-motion to vacate/modify the Consent Confidentiality Order dated September 26, 2014; and (v) the September 26, 2014 Consent Confidentiality Order (Docket Entry No. 53/54).

### A. TGG's July 20, 2015 Motion to Compel Discovery & the Supporting Certifications of Bob Kasolas, Esq. On These Motions Outline the Need for the Discovery Still Requested

The discovery record thus far demonstrates that defendant Donald Watkins, Esq. ("Watkins") fraudulently solicited one million dollars ($1,000,000) from TGG in exchange for selling TGG the right to receive one percent (1%) of Watkins' right to receive distributions from the various defendant companies – companies that from all evidence obtained in discovery are worthless companies with no hope of ever generating any financial returns. Watkins was well aware of this when he solicited TGG, yet failed and/or refused to disclose this reality to TGG while making wild and untruthful material misrepresentations to TGG as to certain high profile individuals that were involved with the "Masada" enterprise and the prospects of these worthless

Hon. Cathy L. Waldor
July 5, 2016
Page 3

companies that do not even have a constructed plant or single revenue producing contract. They do not even have employees, payroll records, individual bank accounts, a board of directors, etc. These are facts that Watkins has admitted to in both discovery and his motion papers filed with the Court.

    Contrary to the contentions by Watkins' opposition and/or cross-motion papers therefore, TGG has already articulated and outlined all of the reasons for obtaining the discovery sought in its July 20, 2015 motion to compel and supporting Certification of Bob Kasolas, Esq. at Docket Entry #71 on the Court's ECF docket for this case. Those motion papers are still as relevant today as they were back then on why TGG is entitled to the specific discovery it is seeking, and the reasons for requiring that discovery. Discovery produced by Watkins in the form of both Interrogatory answers and Document Demand responses disturbingly revealed (as admitted by Watkins) that the Masada defendant companies: (i) have no employees despite purportedly having 47 companies all over the world; (ii) that Watkins is the alleged sole employee of all these companies; (iii) that defendants entire "Board of Directors" were all independent contractors that served as "part-time consultants"; (iv) that there are no payroll records for any of the defendant companies; (v) that all the alleged business operations of the defendant companies were all located overseas; (vi) that all alleged defendant companies were pre-revenue companies that had no contracts that generate any kind of financial income or revenue (vii) that TGG's $1,000,000 investment with Mr. Watkins was wired directly to Donald Watkins' law firm, Donald V. Watkins, P.C.'s ("DVWPC") bank account; (viii) that DVWPC is somehow the sole funding source for all "Masada related business operations and activities"; (ix) that Mr. Watkins could not segregate or itemize what TGG's $1,000,000 had been expended upon since the

Hon. Cathy L. Waldor
July 5, 2016
Page 4

$1,000,000 went into DVWPC's bank account and had been co-mingled with Mr. Watkins' personal funds; and (x) that DVWPC was the sole designated payee of any and all funds stemming from Mr. Watkins' interest in Watkins Pencor, LLC and any ultimate sale, profits and/or success of the defendant businesses. See Kasolas July 20, 2015 Cert. at Docket No. 71.

Notably, TGG cites the beginning portion of the revised Fed. R. Civ. Pro. 26(b)(1) in its cross-motion brief, but fails to quote the entire Rule pertaining to the accessibility of the discovery sought in an action:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, **considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable**. Fed. R. Civ. Pro. 26(b)(1) (emphasis added).

Given the fact that the defendant "Masada" companies all appear to be shell companies that have no contracts to generate any business, have no revenue, have no employees, have no individual bank accounts tied to separate tax identification numbers and intermingle their assets with Watkins' law firm's bank account for all funds in and out of the purported Masada entities, have no business operations of any kind, no building facilities and/or any other indicia that one would expect to see from a real company or set of affiliated companies, all of the documents TGG seeks are highly relevant to this case under Fed. R. Civ. Pro. 26(b)(1) and directly proportional to TGG's claims. This is because all of the documents sought will demonstrate or

Hon. Cathy L. Waldor
July 5, 2016
Page 5

have the likelihood of proving or disproving that the entire "Masada" enterprise of companies is one large "ponzi scheme" that has no value. These documents will also prove or disprove that the valuations Watkins has assigned to these companies in selling interests relating to them are completely fraudulent, obscene and unwarranted and/or that such interests have been oversold. They will further prove or disprove that there is no financial activity of any kind going on with any of these companies that will ever generate any return on TGG's purchase of "nothing."

  Regarding application of Fed. R. Civ. Pro. 26(b)(1), TGG is out $1,000,000 plus the legal fees and costs in asserting this litigation.  This represents a significant amount of money in comparison to the relatively small number of documents being requested.  In addition, Watkins has simple and immediate access to all of the documents being requested at his home office, which he admits is where he keeps all hard copy records rather than having them digitally stored. The economic participation agreements are admittedly one to two pages at most and it cannot be argued they constitute a burden to produce.  Moreover, there is nothing confidential about them since Judge Chesler's rulings on April 8, 2014 held that the TGG economic purchase agreement is not subject to the Masada Resources Group, LLC ("MRG Operating Agreement"), and therefore not subject to any confidentiality clauses or arbitration provisions pertaining to that MRG Operating Agreement.  The same is true of the bank statements for the DVWPC bank account – which he already produced but intentionally redacted all of the payor and payee information to preclude TGG from conducting any type of forensic accounting analysis to determine whether any money is even allocated to or from any of the purported Masada defendant shell companies.  Meanwhile, TGG has been intentionally kept in the dark even since filing this lawsuit and all aspects of the current status of the Masada business operations, dates of

profitability, exit plans, income, cash position, investor makeup, etc. All of these issues demonstrate there is an important stake in TGG accessing these documents to prove its claims against Watkins.

Moreover, Watkins and his defendants shell companies failed and/or refused to demonstrate to the Court any of the Fed. R. Civ. Pro. 26(b)(2)(C) elements for limiting the discovery sought by TGG. Watkins has demonstrated absolutely nothing "unreasonable, cumulative or duplicative" about the document requests made by TGG, or that they can somehow be "obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. Pro. 26(b)(2)(C)(i). To the contrary, none of the economic participation agreements, bank statements (in an un-redacted format), Middletown project litigation documents and/or other financial documents sought have ever been produced despite the passage of over one year. Additionally, TGG has not been provided "ample opportunity to obtain the information by discovery" since Watkins has been stonewalling TGG for over one year now just on TGG's pending motion to compel discovery filed July 20, 2016. Fed. R. Civ. Pro. 26(b)(2)(C)(ii). Moreover, Watkins has not demonstrated or made an effort to demonstrates that "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action and the importance of the discovery in resolving then issues." Fed. R. Civ. Pro. 26(b)(2)(C)(iii). As a result, Watkins cannot ask the Court to limit the discovery TGG seeks that goes directly to the heart of the issues in this case. Given the factual background over the "Masada" companies and that they possess all of the classic signs of phantom and/or

BRACH EICHLER LLC

Hon. Cathy L. Waldor
July 5, 2016
Page 7

fraudulent companies that are merely shells or fronts for Watkins, the documents sought by TGG are even more critical.

    Consequently, the following documents are still highly critical to TGG's discovery needs in order to prepare and present its case at trial: (i) all economic participation agreements for the "Masada" companies; (ii) all unredacted bank records for Watkins' law firm bank account, which is the de facto bank account for all Masada entities (stating these bank records belong to his law firm is merely semantics and an illegal activity given the tax identification number tied to that bank account); (iii) all yet to be produced tax returns for all "Masada" companies; (iv) all litigation records, filings and litigation documents for the Middletown project that most of the defendant entities actually pertained to; (v) specific tax returns for certain defendant companies that Mr. Watkins has claimed somehow do not file tax returns; (vi) all contracts or agreements of any kind that will generate or do generate cash flow for any defendant business entity given the fact Mr. Watkins has repeatedly claimed in Interrogatory answers and supplemental answers that all defendant answers are "pre-revenue" companies; and (vii) all investment accounts that Donald V. Watkins, Esq. has.  The same reasons that existed for their request on July 20, 2015 still exist before the Court over one year later despite the obstructive efforts of Watkins.

    Notably, if Watkins did not have anything to hide as to these documents, he would have simply agreed to produce them under the protections of the existing Confidentiality Order to demonstrate TGG's allegations are incorrect.  His refusal to do so despite the protections offered by the Confidentiality Order are a strong indications that the allegations TGG has advanced based upon the admissions by Watkins are very likely true, and that the entire "Masada" enterprise is a "ponzi scheme" utilized to defraud investors such as TGG.

Hon. Cathy L. Waldor
July 5, 2016
Page 8

### B. The Kasolas Certification Merely Presents Facts That Are Public Record and the Court Is Authorized to Take Judicial Notice of Them In This Matter

Pursuant to Fed R. Evid. 201, this Court can and should respectfully take judicial notice of every single litigation and the allegations and exhibits in those cases outlined in the Kasolas Certification, as well as all of the publicly and electronically filed pleadings from those litigations involving Watkins and his affiliated companies.  The Kasolas Certification outlines Watkins' pervasive, systematic and detailed pattern of wrongful conduct in receiving borrowed or invested money from lenders and/or investors respectively, and then never returning such funds.  In all of these instances, he then engages in an obstructive and hotly contested litigation utilizing his attorney background by filing every motion imaginable, and making every conceivable claim to blame the wronged party.  He also bunkers down in delaying discovery while producing as little documentation as possible during the course of discovery.

The identical pattern of behavior in those other pending and public litigations has been exemplified in this action, which tellingly commenced in August 2013 and has recently resulted in an over one year stalemate in extracting any discovery from Watkins.  Following commencement of this action, TGG was met with a frivolous motion to compel arbitration and motion to dismiss, followed by discovery obstruction, motions to dismiss and motion efforts to smear the principals of TGG.  This typical course of conduct is evidenced in this instance by the significant discovery motion practice in this case, and the fact that TGG's motion to compel discovery was filed on July 20, 2015 – almost one year ago.  The business and financial records that TGG has been demanding since before that time (as articulated in the Certification of Bob

Hon. Cathy L. Waldor
July 5, 2016
Page 9

Kasolas, Esq. with Exhibits (Docket No. 71) for well over one year now have never been produced no compromise has been offered by Watkins.

Contrary to Watkins' arguments, Local Civ. Rule 7.2(a) does not bar the Certification or the exhibits attached to it. The litigation filings and exhibits backing up all of the facts set forth in the Certification concern the other lawsuits against Watkins similar to the one before the Court, and the organizational chart of the "Masada" companies was prepared based on personal knowledge from the limited discovery Watkins has produced thus far after repeated motion practice. The other lawsuits are easily readable by anyone as are all of the disclosed facts that are set forth in the undersigned's Certification. Moreover, the Watkins' defendants' motion to strike the undersigned's Certification must be denied since pursuant to Fed R. Evid. 201, the Court can take judicial notice of publicly available facts as follows:

> **(a) Scope.** This rule governs judicial notice of an adjudicative fact only, not a legislative fact.
>
> **(b) Kinds of Facts That May Be Judicially Noticed.**
>
> The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.
>
> **(c) Taking Notice.**
>
> The court: (1) may take judicial notice on its own; or (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.
>
> **(d) Timing.** The court may take judicial notice at any stage of the proceeding.

Hon. Cathy L. Waldor
July 5, 2016
Page 10

In this instance, all that the undersigned has done is obtain numerous publicly filed litigation records from federal court jurisdictions from various part of the country. These litigations contain filed business documents, settlements and/or bankruptcies that Watkins has been involved in. None of these litigations or the exhibits attached in those litigations can be reasonably disputed and are generally known to the entire federal court system and anyone reviewing PACER. The allegations in those litigations, Watkins' settlements and contractual agreements filed in those cases, the claims in those cases, the amounts not returned by Watkins, etc. are accurately and readily determinable from reading those pleadings and court filings. While Watkins wishes to put his own spin on the irrefutable fact he has a systematic and historical pattern of not returning any invested or borrowed funds in transactions he becomes involved in, the realities in those cases cannot be questions. Watkins' pattern of conduct is the same in all of these litigations: investors or lenders looking to recovery millions they contend they were misled and/or defrauded out of with no accountability for the money.

Even without Fed R. Evid. 201, Watkins could not argue against the Court accepting those documents and their explanation in the undersigned's Certifications since the Certification merely points out what the public filings and pleadings themselves state. TGG has the right to therefore discover who has been an investor or lender in the "Masada" enterprise, what they have been promised by Watkins, what capital structure or valuation was placed on their interests, what their knowledge is of the overall business, whether they have been similarly defrauded, whether the same misrepresentations were made to them, whether they have ever received their money back, whether they have received any updates or accountings on their investments, etc. Given Watkins' pattern across the country in receiving millions and millions of dollars in investor

Hon. Cathy L. Waldor
July 5, 2016
Page 11

and/or lender funds and never returning those funds, while becoming entrenched in litigations with all of those third-parties and in discovery battles, these publicly available and noticeable facts respectfully demonstrate why TGG is entitled to all of the economic participation agreements for the entire "Masada" enterprise of investors and/or economic participation interests.

As argued to the Court in the July 20, 2015 motion to compel still pending before this Court, these economic participation agreements between Mr. Watkins/Watkins Pencor LLC and other third-parties are undeniably some of the most highly relevant documents in this case. They can and/or will demonstrate information that: (i) will lead to the discovery of other third-party witnesses that have been defrauded by Mr. Watkins and his "Masada" ponzi-scheme, along with all of the documentary evidence and testimony that these witnesses possess concerning their inducement into this "ponzi scheme"; (ii) will establish the fraudulent "valuation" that Mr. Watkins assigned to his alleged interests in Watkins Pencor, LLC and the other defendant Masada companies that are supposed to generate the profits needed to repay TGG's $1,000,000 investment and provide him with an addition return on the investment (notably, the $1,000,000 valuation that Mr. Watkins placed on the 1% interest he sold to TGG means that his interest in Watkins Pencor LLC alone is valued at $100,000,0000); (iii) may/will evidence that Mr. Watkins fraudulently overinflated the value of the defendant companies and/or what he sold to TGG by millions of dollars in comparison to illusory and worthless nature of these alleged "pre-revenue" companies, which have no employees, no Board of Directors, no planned or constructed waste-to-ethanol plants, no third-party contracts to generate any revenues, no assets and apparently no valuable intellectual property; and/or (iv) that Mr. Watkins sold more interest in his alleged right

Hon. Cathy L. Waldor
July 5, 2016
Page 12

to receive distributions from the Masada companies through Watkins Pencor LLC that there actually exists and/or that could possibly be recovered to repay TGG's and every other third-party investor in Mr. Watkins' "ponzi scheme."

The above reasons are legitimate needs for the economic participation agreements. This is especially true since discovery has also yielded numerous written proposals and/or agreements with individuals to render services for defendants in exchange for the promise of an equity interest in defendant companies. Consequently, it may very well be possible that Mr. Watkins has promised to pay out and/or to transfer more equity to third-parties such as TGG than there even exists in these questionable companies. The same is true of the valuations he has assigned to these companies in doing business with third-parties. Telling, Watkins' Certification make TGG's legal arguments for plaintiff. Regarding the Detroit pension fund litigation against him, Watkins acknowledges he duplicitously pledged "$4,000,000" worth of stock in defendant Pencor Orange as a "capital contribution" to the defendant airline company he owned and controlled in that litigation. This means that its ownership was pledged to a third-party company comprised of its own investors while Watkins concurrently had contractually promised TGG under the subject Purchase Agreement & Irrevocable Assignment of Economic Interests" (the "Purchase Agreement") that TGG would receive one percent of Watkins' distributions from that company. The two stories simply cannot be reconciled.

This example in and of itself regarding Pencor Orange evidences fraudulent and deceptive actions on the part of Watkins in over-pledging whatever purported interests he has in the "Masada" family of companies to multiple investors/participants, and the arbitrary over-valuations he randomly assigned to these companies depending on the situation he finds himself

Hon. Cathy L. Waldor
July 5, 2016
Page 13

in. Notably, the City of Detroit pension systems argues that Watkins misled them about his financial assets and net worth, something he did to TGG as well in misrepresenting the value of the "Masada" entities and the people involved, which appear to be worthless. Watkins had the President of Alamerica Bank that Watkins is an owner in prepare false financial net assets information on Alamerica's letterhead and sent it to the Detroit pension systems to fraudulently induce them into making the monstrous loans and investment into the subject aviation company. This pattern of conduct is similar to what TGG did here in making specific material misrepresentations to TGG.

Contrary to the allegations by Watkins, his own produced discovery reveals he does not even have an ownership interest in any of the actual "Masada" companies, despite his representations to the contrary. He merely controls them by way of an actual "Power of Attorney" and/or "Purchase Agreement" from the two families/individuals that own virtually the entire parent company (CES) and virtually the entire primary holding company intended to carry out CES's business plan for "waste to energy" – MRG. In the event the whole "Masada" operation is ever sold, only then would Mr. Watkins even receive any profits or ownership interest regarding the "CES-Masada" operation after the other owners first receive back all of the money they have invested into the W2E business efforts of these companies. This was never represented to TGG, and discovery concerning the entire atmosphere and pattern of Watkins' efforts to raise capital and/or secure investors for the "Masada" operations if fully discovery since it can lead to the discovery of admissible evidence and witnesses pertinent to this matter.

Finally, the argument Watkins makes about TGG having to travel to Alabama to inspect documents it is requesting is absurd. Under Fed. R. Civ. P. 34(a)(1), TGG can demand that

Hon. Cathy L. Waldor
July 5, 2016
Page 14

Watkins produce documents requested without TGG having to travel to Alabama. Most importantly, this Court already specifically resolved this issue at the inception of this case by entering an October 16, 2014 Discovery Order directing Watkins and his defendant companies to produce and any all financial records and documents of any kind pertaining to the defendant entities:

> Defendants shall respond to Plaintiff's request for production of documents by providing financial documents relating to the various Defendant Companies, consistent with the bounds as discussed during the teleconference, including tax returns, financial statements, check ledgers, operating agreements, and contracts with vendors.

Watkins has consequently violated the Court's October 16, 2014 Order by refusing to produce the un-redacted bank statements for the defendant companies that Watkins uses for all of them and his law firm. Moreover, his refusal to produce the economic participation agreements for the other 29 individuals further violates the Court's October 16, 2014 Order since those documents pertain to the companies' investors and member/shareholder structure, capital structure, valuation, capital available to fund business operations, profit sharing capability as to the one percent of "nothing" TGG purchased, etc. The same is true of the K-1s that Watkins admittedly has never produced to TGG, something that is a violation of tax code law since TGG has an economic participation interest in the defendants. Consequently, TGG is not required to travel to Alabama simply to mark documents for copying it has already asked for in this case and that are subject to the Court's October 16, 2014 Order. Transparently, the effort to make TGG do so is merely a strategy by Watkins to further delay this matter, impose additional financial

costs on TGG and to obstruct the production of discovery needed to advance this case for as long as possible so that Watkins can buy himself time.

### C. Watkins' Dispute of the Facts Demonstrated by All the Public Lawsuits Against Him Do Not Mandate for Striking an Opposing Certification Highlighting Facts and Documents From Those Cases

Merely because Donald Watkins does not agree with the facts and allegations from all of the other publicly filed and available lawsuits against him throughout the country does not mean there is any basis to strike the Certification of the undersigned highlighting relevant portions of those cases. The same is true of the undersigned outlining and describing the discovery that Watkins has forcefully produced to date and what it demonstrates, as justification of TGG to demand the discovery it is still attempting to obtain with its July 20, 2015 motion to compel still pending before this Court. The chart was constructed based upon the personal knowledge of TGG's counsel after reviewing everything that has been produced by Watkins – which is now confirmed to be incomplete and deficient by Watkins' own admission. The same is true regarding Watkins' claims that the "Masada organization chart" created by plaintiff's counsel to explain the family network of companies comprising the "Masada" family of companies. Watkins claims this is somehow "a modified version of an old chart," but does not explain why he produced an old chart as opposed to an updated one. This is additional indicia of his lack of corporate formalities and deceptive actions in actually disclosing his relationship within these companies, and the companies' relationships among each other as well. Tellingly, he does not explain what the purported "ownership restructuring transactions from December 2015 through March 2014" are that somehow gave him some additional ownership in certain "Masada"

entities. He also offers no explanation of the other purported 47 companies outside the USA, none of which makes any money, have any contracts or have a physical plant actually built.

Moreover, Watkins has "opened the door" to discovery of on the economic participation agreement by contending in his litigation against the SEC that that no other economic participant in the Masada companies has made any type of claims against Watkins. TGG now has the right to challenge that factual allegation that is relevant in this case and to determine if such individuals are in fact making allegations similar to TGG. If they are, such witnesses and their testimony as to their inducement, lack of information, lack of payments and/or the total valuation and percentages of interest assigned to them is highly relevant to Thomas' claims against Watkins and TGG's claims of fraudulent inducement and conversion.

Watkins claim the production of bank statements are somehow now moot because his law firm has been temporarily let out of the case is an absurd argument of semantics rather than substance. Before his law firm was even named in this litigation, Watkins himself voluntarily produced the Quickbooks check ledger and the redacted bank statements for DVWPC <u>on his own</u>. In particular, Watkins voluntarily produced his law firm's check ledger in response to TGG's discovery demands for such documents from all the defendant entities. Coupled with that, Watkins admitted in discovery that he had commingled all funds belonging to each defendant entity with his own firms bank account in one cauldron, and that his law firm's bank account served as the sole bank account for all of these different defendant companies. He further alleged that as a result of this, he could not determine how or where TGG's investment was used, and further admitted none of it went to any Masada" related entity because the money belonged to Watkins as a result of his sale of "nothing" to TGG.

BRACH EICHLER LLC

Hon. Cathy L. Waldor
July 5, 2016
Page 17

Consequently, other than calling it the bank account for his law firm and the account likely being tied to his firm's tax identification number, nothing demonstrates that this bank account is only an account for DVWPC.  To the contrary, everything that Watkins has admitted to in discovery confirms unequivocally that the bank account belongs to all of the defendant entities and is used by all of the defendant entities. It is therefore the bank account for all defendant "Masada" companies and is fully discoverable in this case, regardless of being assigned to DVWPC's name and tax identification number.  These bank statements must therefore be produced under the facts and legal claims set forth in this case to determine what legitimacy or funding the defendant companies even have, which appears to be none.

While Watkins make conclusory and self-serving contentions as to the lack of relevance regarding the Middletown, New York project, he does not dispute that: (i) virtually all of the defendant companies were exclusively part of the corporate structure for the construction and operations of that sole and specific plant; (ii) that Masada never sought to construct any other specific plant in the United States; and (iii) that the project had already been defeated and blocked by the local government authorities by the time Watkins fraudulently solicited TGG to invest in these defendant entities when Watkins was fully aware that there was zero possibility of TGG ever seeing a penny from any investment in these entities.  Watkins' continued harping on the number of boxes pertaining to the Middletown, New York litigation is a therefore "red herring" designed to avoid producing these litigation documents that will convincingly demonstrate his clear fraud upon TGG to induce the $1,000,000 purchase of an interest in "nothing."

Hon. Cathy L. Waldor
July 5, 2016
Page 18

Specifically, at the time Watkins fraudulently induced TGG to enter into the Purchase Agreement, the Middletown project was already defeated and dead. Nevertheless, most of the companies listed in the Purchase Agreement pertained to that project, meaning that Watkins sold TGG the right to receive one percent (1%) of distributions from companies (and ultimately that Watkins Penco LLC was entitled to) that had no hope of ever generating a penny of profits. This is the classic definition of fraudulent conduct, thereby necessitating Watkins' producing of all litigation records relevant to that litigation without the need for TGG to have to travel to Alabama to obtain those records. Such records are the responsibility of Watkins to produce both as a defendant and since TGG is an investor in the outcome of the Middletown project.

Lastly, Watkins has not produced 47 "business alliance agreements" from 47 countries, contrary to Watkins' allegations. In fact, not a single contract has been produced that can generate any revenues for any Masada company. Telling, the boasting of a what Watkins calls "business alliance agreement" in Charlton County, Georgia has never been produced or disclosed to TGG – or from anywhere else in the world for that matter. This further highlights the abuse that Watkins has imposed on TGG and this Court during the discovery process. In fact, not a single piece of discovery has been produced to TGG on that purported fact. Watkins' Certification also makes no mention of when TGG can expect the tax filings for the 2015 year, which is highly relevant to see what alleged investments or capital expenditures these defendant companies are making to somehow create a return on the phantom one percent (1%) interest that Watkins sold to TGG.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that: (i) defendants' cross-motion to strike the Kasolas Certification be denied (ii) that TGG's July 20, 2015 motion to compel be granted in its entirety; (iii) that TGG's cross-motion to vacate and/or modify the Confidentiality Order in this case be granted; and (iv) that defendants' motion for a protective order and to seal the Purchase Agreement already made public be denied.

Respectfully submitted,

Bob Kasolas

cc: Caroline F. Bartlett, Esq. (via ECF)
      Joe R. Whatley Jr. (via ECF)